**William J. PERRY, Secretary of Defense, Appellant,**

v.

**MARTIN MARIETTA CORPORATION, Appellee.**

**No. 93–1164.**

United States Court of Appeals, Federal Circuit.

Feb. 10, 1995.

Harold D. Lester, Jr., Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellant. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

Terry L. Albertson, Crowell & Moring, Washington, DC, argued for appellee. Of counsel was Jeffrey M. Villet.

Before ARCHER, Chief Judge,* SMITH, Senior Circuit Judge, and MAYER, Circuit Judge.

ARCHER, Chief Judge.

The Secretary of Defense appeals the decision of the Armed Services Board of Contract Appeals (board), ASBCA Nos. 38,920 and 41,565, 92–3 BCA ¶ 25,175 (1992), holding that Martin Marietta Corporation's (MMC) 1986 internal corporate reorganizations did not result in a change in cost accounting practices, other than those already reported and disclosed by MMC, under the terms of its cost-type contracts. We affirm.

## DISCUSSION

### I.

A. MMC is a large, diversified company with many government contracts. Among these are cost-type contracts subject to the Cost Accounting Standards (CAS), a set of accounting standards for government contracts promulgated by the Cost Accounting Standards Board (CASB). *See* 4 C.F.R. § 301.2 (1992).[1] These standards are incorporated into the Federal Acquisition Regulation (FAR), which in turn provide for the inclusion of appropriate contract clauses in government contracts.[2] One of these contract clauses requires a contractor to provide the government with notice of any changes in cost accounting practices. *See* FAR 52.230–3. Such notice must include a cost impact proposal. *See* FAR 52.230–4. This allows an adjustment to be made to the contract if the change in accounting practice results in an increase in cost to the government.

In this case, the Secretary claims that certain organizational changes made by MMC as a result of its internal corporate reorganizations in 1986 resulted in a change to a cost accounting practice within the meaning of the CAS and FAR. *See* FAR 52.230–3. The Secretary contends these changes required MMC to file a cost impact proposal that could result in an adjustment being made to at least some of MMC's CAS-covered contracts.

B. In the early 1980s, MMC was structured so that there were three intermediate home offices that reported to its corporate headquarters. One of these home offices, Aerospace Headquarters (ASH), was responsible for MMC's government contract work and had five business segments that reported to it. Three of the segments (Baltimore, Orlando, and Michoud) performed aerospace work, one segment (Air Traffic Control) performed information and communications systems work, and one segment (Denver Aerospace) performed both. The indirect expenses incurred by ASH and its segments were collected and grouped in three different cost pools (marketing, foreign marketing, and residual) at ASH. These indirect expenses were then proportionally allocated (by sales, foreign sales, and total cost input) to the five business segments and, in turn, to the various government contracts that the segments were performing.

---

* Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

1. The CAS are now codified in Part 99 of Title 48 of the Code of Federal Regulations, the same title where the FAR are published. For convenience, we refer in this opinion to the 1992 version of the C.F.R. that was relied on by the board, unless it is indicated otherwise.

2. MMC's CAS-covered contracts with the government included the FAR 52.230–3 and 52.230–4 clauses entitled "Cost Accounting Standards (Apr.1984)," and "Administration of Cost Accounting Standards (Apr.1984)," respectively.

In January 1986, MMC underwent internal corporate reorganizations. MMC abolished ASH and realigned the segments that had previously reported to it. Some of the segments were realigned to report directly to MMC corporate headquarters. Others were assigned to a newly created intermediate home office, Information & Communications Systems Headquarters (I & CSH). The segments reporting to corporate headquarters included the Baltimore, Orlando, and Michoud aerospace businesses and the aerospace business portion of Denver Aerospace. The new I & CSH segments included Air Traffic Control and the information and communications business portion of Denver Aerospace.

After this reorganization the indirect expenses previously accumulated in the three pools at ASH were split among the pools at the corporate headquarters and at the I & CSH. The former ASH indirect costs related to aerospace functions were accumulated in the marketing, foreign marketing and residual pools at corporate headquarters, and the former share of ASH indirect expenses related to the segments transferred to I & CSH were accumulated in its marketing and residual pools.

MMC filed a cost impact proposal as a result of the reorganizations, disclosing that it had made certain changes in its accounting practices within the meaning of its contract clauses concerning the CAS.[3] These changes involved how costs were allocated from the cost pools to the segment bases. Costs that had been previously allocated from the pools on the basis of a single factor such as "sales" or "total cost input" were now to be allocated on the basis of a three factor formula. MMC did not include as an accounting practice change any changes in the grouping of indirect costs or business segments resulting from the reorganization. The submitted proposal was audited by the Defense Contract Audit Agency (DCAA) which determined the cost impact to the government was insignifi-

cant and that no contract adjustment was necessary.

C. The transfer of the management function for information and communication systems from ASH to I & CSH resulted in an increased allocation of cost to a Federal Aviation Administration (FAA) contract that was being performed by a business segment under I & CSH. The FAA contracting officer decided the reorganization itself effected a change in cost accounting practices which required MMC to submit a cost impact proposal and required an adjustment to the FAA contract. The FAA contracting officer, therefore, did not allow reimbursement of the increased cost allocated from I & CSH pools to the FAA contract.[4]

Believing that the FAA contracting officer was not the cognizant contracting officer, MMC requested a decision from the Department of Defense (DOD) contracting officer. When the DOD contracting officer failed to issue a decision within 60 days, MMC appealed the deemed denial of its claim to the board on May 30, 1989 (ASBCA No. 38,920). After the appeal to the board, the DOD contracting officer issued a decision finding that MMC's reorganization did result in changes in accounting practices based on changes in home office cost and segment groupings and required submission of a new cost impact proposal. MMC also appealed this decision to the board (ASBCA No. 41,-565).

The board rendered a decision in favor of MMC in the two consolidated appeals. The board distinguished between "changes in cost and segment groupings (organizational changes)" and "changes in the proportional allocation method (accounting method changes)." It held that the organizational changes, which occurred as a result of MMC's reorganizations, did not constitute changes to an accounting practice. The Secretary has appealed.

---

3. The parties stipulated that MMC's cost impact proposal identified three specific changes in accounting "method or technique" resulting from the abolishment of ASH.

4. On June 15, 1989, MMC filed a suit in the United States Claims Court on the decision of the FAA contracting officer, which has been stayed pending resolution of the two consolidated appeals before the board that are herein appealed.

## II.

This case requires the interpretation of two FAR provisions, FAR 52.230–3 and 52.230–4, which were incorporated into MMC's CAS-covered contracts.[5] These FAR provisions were intended to implement the CAS, the CAS being the source for the language and authority for these provisions of the FAR. Thus our task in interpreting the meaning of these FAR provisions is ultimately to ascertain the CASB's intended meaning when it promulgated the CAS.

■ Our standard of review in this case is dictated by the Contract Disputes Act of 1978 (CDA). Under the CDA, this court reviews factual determinations of the board under a substantial evidence standard and legal questions under a de novo standard. 41 U.S.C. § 609(b). The interpretation of regulations incorporated into a contract is purely a legal question. *Riverside Research Institute v. United States,* 860 F.2d 420, 422 (Fed. Cir.1988). Because this case only involves legal issues, our review of the board's decision is plenary. *See United States v. Boeing Co.,* 802 F.2d 1390, 1393 (Fed.Cir.1986) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve." (citations omitted)).

■ We note that while an agency's interpretation of its own regulations is normally entitled to considerable deference, *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965), such deference is not required here because the FAR and the underlying CAS are not regulations of the Department of Defense. *See Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1551 (Fed.Cir.1993) (rejecting contention that when the Department of the Navy interprets the FAR it is interpreting its own regulations).

■ Our interpretation starts with the language of the two FAR clauses at issue. Both clauses contain the disputed language "change in cost accounting practices." FAR 52.230–3, 4. The FAR itself provides no further guidance on the meaning of this language. Because these FAR provisions implement the CAS, however, we also look to any guidance the CASB has published to aid in interpretation. The CAS regulations define a "change to a cost accounting practice" to be "any alteration in a cost accounting practice as defined in paragraph (k) of this section." 4 C.F.R. § 331.20($l$). Paragraph (k), in turn, defines "cost accounting practice" as "any disclosed or established *accounting* method or technique which is used for measurement of cost, assignment of cost to cost accounting periods, or allocation of cost to cost objectives." 4 C.F.R. § 331.20(k) (emphasis added). Thus, the regulations reflect the CASB's intent to define cost accounting practices as cost *accounting* "methods or techniques."

The underlying cost accounting practice used by MMC for allocating indirect costs to business segments is the "beneficial or causal relationship" test. This is the accounting principle all government contractors must follow when allocating indirect costs. *See* 4 C.F.R. § 418.40(c) ("Pooled costs shall be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives...."). In following this principle, indirect costs incurred from a segment base are accumulated in various cost pools according to a particular methodology. These cost pools are then allocated back to the segment base and their corresponding cost objectives (the CAS-covered contracts the segments are performing) in proportion to the relative benefits received on the basis of an established methodology (for example, "direct labor costs" or the "three factor" formula under CAS 403 for allocating home office costs).

---

**5.** The first provision, FAR 52.230–3, provides in pertinent part: "If any change in cost accounting practices is made for the purposes of any contract or subcontract subject to CASB requirements, the change must be applied prospectively to this contract...." FAR 52.230–3(a)(2). The other provision, FAR 52.230–4, sets forth the contractor's responsibilities if a change in cost accounting practice is made, including the requirement that the contractor "[s]ubmit a cost impact proposal in the form and manner specified by the cognizant Contracting Officer...." FAR 52–230–4(b).

The Secretary argues that a change in accounting "method or technique" includes any change in the size and composition of the segment base or cost pools. Thus if a segment base is expanded by putting more segments into the base, or by merely increasing the size of the underlying segments, the Secretary contends there is a change in accounting methods or techniques that requires the contractor to file a cost impact proposal. On the other hand, MMC contends the board correctly held that changes in cost accounting methods or techniques do not encompass such size changes, but rather that they are limited to changes in the methodologies of how indirect costs are accumulated in cost pools or are allocated to the segment bases.

The additional interpretive aids published by the CASB in its regulations convince us that the board and MMC have correctly interpreted the regulatory language at issue. In its regulations, the CASB set forth illustrations to show what are and are not changes to a cost accounting practice. *See* 4 C.F.R. § 331.20(m)(2) (1992) (illustrations "which meet the proposed definition of change to a cost accounting practice"); 4 C.F.R. § 331.20(m)(3) (1992) (illustrations "which do not meet" the definition). The illustration at 4 C.F.R. § 331.20(m)(2)(iii)(3) is the most relevant to our decision. It describes a situation where a contractor merges two operating segments, segment A and segment B. Before the merger, segment A allocates the costs of the overhead manufacturing pool to a final cost objective using direct labor hours. Segment B allocates the costs using direct labor dollars. After the merger, the combined segments decide to allocate costs using direct labor dollars. The only change in accounting method or technique identified in this example is the change from direct labor hours to direct labor dollars. This is a change in the *proportional allocation* of costs that occurred as a result of the merger of the segments. As noted by the board, the CASB did not identify any changes in cost accounting methods or techniques from the expanded overhead pool or expanded base of the

merged segments to which the costs were allocated. Thus, the organizational change by itself apparently was not considered to be a change in cost accounting practice.[6]

Applying the illustration described above to the present case, the fact that the size and composition of the overhead cost pool and segment base are changed as a result of the merger would not be treated as a change in a cost accounting practice. Only if there were a change in the methodology of how costs are accumulated in the overhead pool or allocated to segments would the CASB illustration result in a change in a cost accounting practice.

The Secretary argues that the illustrations were not meant by the CASB to identify all changes that might result in changes in cost accounting practices. *See* 4 C.F.R. Part 331, Preamble J ("By including the illustrations [CASB] does not intend to imply that all possible situations are covered nor are the illustrations to be used as limitations for accounting changes."). They are, nevertheless, persuasive evidence of the CASB's intended meaning of the regulations. The Secretary has given us no reason to believe the CASB would publish incomplete, and possibly misleading, illustrations. We are therefore convinced that the board's reliance on this illustration was justified and supports its conclusion that where organizational changes merely result in a change to the size of the cost pool or a segment base to which costs are to be allocated, no change in cost accounting practices has occurred.

The Secretary further argues that other illustrations support its position that any change in the size or composition of cost pools or the grouping of segments is a change in accounting practices. Our review of those illustrations, however, leads us to a different conclusion.

The Secretary points to the illustration at 4 C.F.R. § 331.20(m)(2)(iii)(1), which describes a situation where a contractor operating under CAS 410, 4 C.F.R. Part 410, has been allocating its G & A expense pool to a

**6.** The board also noted that during the CASB's development of the CAS regulations, the CASB staff considered and rejected a proposed illustra-

tion that would have supported the government's interpretation.

final cost objective on a total cost input base. When the contractor's business changes substantially, in that there are new projects with insignificant quantities of material, the changed circumstances reveal there would be a distortion in the allocation of the G & A expense pool in relation to the benefit received. Therefore, the contractor changes from a total cost input base to a value added base to comply with CAS 410, creating a change to a cost accounting method or technique requiring disclosure under the CAS.

The Secretary argues that the contractor's action involved a change in the selection and composition of the base, which resulted in a change to a cost accounting practice. While we agree there was a change in a cost accounting practice, as we read the illustration the change was one in allocation methodology, from a total cost input base to a value added base. This is entirely consistent with the interpretation by the board based on the illustration at 4 C.F.R. § 331.20(m)(2)(iii)(3) that a change in accounting practice refers to changes in allocation methodology rather than to a change in the composition and size of cost pools and grouping of segments.[7]

The preambles in the CAS regulations provide further evidence of the intent of the CASB in using the phrase "change to a cost accounting practice." The preambles, which were first published with the proposed regulations in the Federal Register, are intended to explain the regulations in "non-technical" language. See 48 C.F.R. § 30.101(d) (1993) ("The preambles are not regulatory but are intended to explain why the Standards and related Rules and Regulations were written...."). At Preamble J, the CASB commented on the definition of a "change to a cost accounting practice." The CASB recognized that in a "dynamic business environment" there were likely to be business changes of many types including "organizational changes, changes in the way work is performed, and changes in the product produced." 4 C.F.R. Part 331, Preamble J. Yet the CASB determined that "[t]hese business changes by themselves are not changes in cost accounting practices. Such changes may, however, cause a change in a contractor's cost accounting practices." Id. Thus the CASB understood that in a business there will necessarily be many organizational changes but concluded that under its regulations such changes would not necessarily cause a change to a cost accounting practice.

The CASB's explanation of the meaning of the language "change to a cost accounting practice," as set forth in Preamble J, does not comport with the Secretary's position on the regulations.[8] Under the Secretary's definition, any change to the size or composition of cost pools or grouping of segments, no matter how small, would technically be a change to a cost accounting practice requiring the contractor to submit a cost impact proposal. This definition would require a contractor to file an enormous number of proposals because, as the CASB recognized, there are many changes required in a "dynamic business environment." This construction is inconsistent with the CASB's understanding that business changes of themselves are not changes in cost accounting practices.

We conclude that the phrase "change to a cost accounting practice," as used in the FAR and MMC's CAS-covered contracts, refers to changes in the proportional measurement, assignment or allocation of costs. The Secretary's contention that merely changing the size of cost pools or the grouping of segments as a result of a reorganization causes a cost accounting practice change must be rejected. Organizational changes alone do not

7. The other illustrations relied on by the Secretary to rebut the board's interpretation, illustration nos. 5 and 7 at 4 C.F.R. § 331.20(m)(3), merely define what does *not* meet the definition of a "change to a cost accounting practice." These illustrations do not compel the result advocated by the Secretary and do not overcome the illustration in subsection (m)(2) relied on by the board.

8. MMC argues that the government shared its interpretation of the FAR until February 1988, when the Defense Contract Audit Agency (DCAA) issued its new guidance on the meaning of "a change in cost accounting practice." The Secretary argues the government did not. Regardless of whether or not the government originally shared the same interpretation, the record demonstrates that the government never published its present interpretation until the 1988 DCAA Audit Guidance.

**1140**

create a change in a cost accounting practice.[9]

It is undisputed that MMC properly disclosed changes in the proportional measurement, assignment, or allocation of costs resulting from the reorganizations. Therefore, in light of the proper interpretation of the FAR provisions in dispute, there was no other change to a cost accounting practice resulting from the reorganizations that was not disclosed by MMC.

*AFFIRMED.*

---

9.  As noted by the board, the government is not without a remedy against contractors who deliberately manipulate their accounting systems to increase recovery of their costs. The Truth in Negotiations Act, Pub.L. No. 87–653, § 1(e), 76 Stat. 528–29 (1962) (codified as amended at 10 U.S.C. § 2306(f)), requires contractors to have valid business justifications for the actions they take.