**ALLEGHENY TELEDYNE INCORPO-RATED, Teledyne, Inc., Teledyne Industries, Inc., and Teledyne Electronic Systems, Inc., Plaintiffs–Appellants,**

**and**

**General Motors Corporation, Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–Cross Appellant.**

Nos. 02–5008, 02–5009, 02–5010, 02–5011.

United States Court of Appeals, Federal Circuit.

Jan. 23, 2003.

Harvey G. Sherzer, Greenberg Traurig, LLP, of McLean, VA, argued for plaintiffs-

appellants Allegheny Teledyne Incorporated, et al. Of counsel on the brief was Scott Arnold.

John L. Rice, Miller & Chevalier Chartered, of Washington, DC, argued for plaintiff-appellant General Motors Corporation. With him on the brief were Alan I. Horowitz, Lynda Troutman O'Sullivan, Anthony J. Trenga, and Christine S. Trafford. Of counsel on the brief was Norman R. Thorpe, General Motors Corporation, of Detroit, MI.

C. Coleman Bird, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Elizabeth G. Candler and David D'Alessandris, Trial Attorneys. Of counsel on the brief were Stephen R. Dooley, Supervisory Trial Attorney, Defense Contract Management Agency, of Boston, Massachusetts; and Lawrence S. Rabyne, Defense Contract Management Agency, of Chicago, IL.

Thomas A. Lemmer, McKenna & Cuneo, L.L.P., of Denver, CO, for amicus curiae Viacom Inc. Of counsel on the brief was Herbert L. Fenster, McKenna & Cuneo, L.L.P., of Washington, DC.

Francis J. O'Toole, Sidley Austin Brown & Wood LLP, of Washington, DC, for amicus curiae General Electric Company. With him on the brief were Howard J. Stanislawski, Mark P. Guerrera, and Jonathan A. DeMella.

Before MICHEL, Circuit Judge, PLAGER, Senior Circuit Judge, and LOURIE, Circuit Judge.

MICHEL, Circuit Judge.

Plaintiffs-appellants Allegheny Teledyne Incorporated, Teledyne, Inc., Teledyne Industries, Inc., and Teledyne Electronic Systems, Inc. (collectively "Teledyne") and Plaintiff-appellant General Motors Corporation ("GM") each separately sued the United States in the United States Court of Federal Claims. In each case the plaintiff challenged the United States' Corporate Administrative Contract Officer's ("CO") resolution of its claims regarding a pension surplus or deficit due to one of the parties as a result of a "segment closing" within the meaning of Cost Accounting Standard ("CAS") 413. Specifically, Teledyne challenged the CO's determination that it owed the government a certain part of its pension surplus because it sold two divisions. GM challenged the CO's conclusion that the government did not owe GM a certain part of GM's pension deficit because GM sold one of its divisions. On cross-motions for summary judgment on the legal issues of the proper interpretation of both the original and the amended CAS 413, the trial court interpreted several of the terms of CAS 413 and accordingly granted-in-part and denied-in-part all motions for summary judgment.

After its partial disposition of the summary judgment motions, the trial court entered an order pursuant to 28 U.S.C. § 1292(d)(2) certifying that it decided "a controlling question of law with respect to which there is a substantial ground for difference of opinion, and that an immediate appeal from this order with regard to that question may materially advance the ultimate termination of this litigation." Both appellants and cross appellant filed petitions for leave to appeal from the interlocutory orders, and this court granted those petitions. The GM and Teledyne cases are now before this court in a consolidated appeal. Because the Court of Federal Claims correctly interpreted the original CAS 413, we affirm all of its rulings before us on appeal.

## BACKGROUND

These consolidated appeals involve claims relating to Teledyne's and GM's sales of certain business segments and "defined benefit"[1] pension plans of those business segments. A contractor sponsoring a "defined benefit" pension plan generally guarantees the payment of the future benefits under the plan and therefore deposits amounts anticipated to be sufficient to pay the benefits to participants for their entire life. These deposits are part of the cost of doing business with the contractor and they are therefore paid, in part, by the contractee in these cases, the government. Determining the proper amount to deposit requires reliance on estimates of a wide range of variables, such as how much the pension assets will earn in the future and when participants will retire. Because of this necessary estimation, Congress empowered the Cost Accounting Standards Board ("Board") to "promulgate cost-accounting standards designed to achieve uniformity and constancy in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Pub.L. No. 91–379, § 719(g), 84 Stat. 796 (1970), (codified at 50 U.S.C. § 2168 (repealed 1988)).[2]

The CASs apply to negotiated government contracts and subcontracts. 48 C.F.R. § 9903.201–1(a)–(b) (2000). The CAS clause, incorporated into these contracts, requires contractors to comply with all CASs in effect and comply with any later modifications or amendments. 48 C.F.R. § 52.230(a)(3) (1998). The CAS clause also allows equitable adjustments when a contractor is required to prospectively comply with modifications or amendments to a CAS. *Id.* § 52.230–2(a)(4)(i). These contracts also incorporate other clauses, including the allowable cost and payment clause[3] and the credits clause.[4]

As a general rule, these standards regulate the allocation of costs to cost objectives, but do not regulate issues of cost allowability or contract pricing. Pub.L. No. 91–379, § 719(h)(1). Allowability is "a procurement concept affecting contract price and in most cases is established in regulatory or contractual provisions." *Cost Accounting Standards Board Restatement of Objectives, Policies and Concepts* (May 1977), *reprinted in Cost Accounting Standards Guide* (CCH) ¶ 2915 (1984). Allocability "is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all of a portion of that cost." *Id.* The difference then is that allocability is simply

---

1. A defined benefit pension plan is one "in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits." 4 C.F.R. § 412.30(a)(6) (1986).

2. At that time a new Board was created under the Office of Federal Procurement Policy Act of 1988 ("OFPPA"). 41 U.S.C. § 422 (2000).

3. Under this clause, if the CAS 413 calculation shows a surplus, the contractor is required "to pay the Government any refunds, rebates, credits, or other amounts ... accruing to or received by the Contractor ... to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government." 48 C.F.R. § 52.216–7(h)(2).

4. This clause implements the allowable cost clause, "[t]he applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." 48 C.F.R. § 31.201–5.

a determination of what portions of a cost are assigned to what party, whereas allowability is a determination of whether one party may apply or recover that cost.

One of these standards, CAS 412, governs how a contractor determines its pension costs for each period—by the contractor's best actuarial estimate of the plan's anticipated earnings and benefit payments, taking into account the plan's past experience and reasonable expectations. 4 C.F.R. § 412.40(b)(2) (1986).[5] The contractor first determines its pension cost as a whole, then allocates those costs among its different segments, then further allocates them among various contracts. Those pension costs allocated to cost-type government contracts are paid by the government if allowed under the Federal Acquisition Regulation ("FAR") and the terms of the particular contract.

Original CAS 413 was issued by the Board in 1977 and became effective in 1978. It provides for two related types of adjustments to a contractor's pension costs: (1) adjustments to account for the pension plan's actuarial gains and losses and (2) adjustments to account for a closed segment's pension surplus or deficit. *Id.* § 413.20. Under normal circumstances, the actuarial gains or losses (differences between the estimates and actual experience) are amortized in equal annual installments over a fifteen-year period. This is not the case, however, when a "segment closing" occurs. Original CAS 413 does not define "segment closing" but does define "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office." *Id.* § 413.30(a)(11). In the event a contractor

closes a segment, original CAS 413 provides that a contractor:

> shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated.... The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment.... The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

*Id.* § 413.50(c)(12).

In 1995 the new Board (created in 1988) amended CAS 413. The amendments were a part of several changes to the regulatory framework brought about by concerns about over-funded pension plans. 60 Fed.Reg. 16,534, 16,534–35 (Mar. 30, 1995). The amendments made two significant changes. First, they specifically defined "segment closing." 48 C.F.R. § 9904.413–30(a)(20) (1995). Second, they added a specific formula for allocating a pension surplus or deficit between the contractor and the government. *Id.* § 9904.413.50(c)(12).

Turning now to the facts before us, the government contends that the sale of divisions by Teledyne and GM constituted "segment closings" under CAS 413 and, therefore, it is entitled to a share of Teledyne's pension surplus but nevertheless is exempt from paying a share of GM's pension shortfall. Teledyne and GM, of course, assert various reasons for the opposite results in their respective cases.

---

**5.** The Board issued CAS 412 in 1975.

Teledyne engaged in two sales of business divisions. The only one relevant on appeal is its January 2, 1995 sale of Teledyne Electronic Systems ("TES") to Litton Industries, Inc. and Litton Systems, Inc. (collectively "Litton"). Pursuant to that sale, Teledyne transferred all of TES's government contracts to Litton and retained all of the pension plan assets and liabilities attributable to TES. The government had stopped making contributions in 1987, after the TES pension plans became fully funded. In November 1995, a government CO contacted Teledyne to request a final accounting of pension assets as required by CAS 413—because the sale was a "segment closing" under CAS 413.[6] On December 18, 1995, Teledyne submitted a final accounting, reporting a $3.3 million surplus measured as of December 31, 1994 and computed based on a 6% expected return. The CO made his first final decision based on the amended CAS 413, claiming $2,883,165 plus interest for the government. Teledyne filed this suit on December 13, 1996 challenging the CO's first final decision on several grounds. Ultimately, the government revised its counterclaim upwards to $13,486,000.

GM's case arose from its 1993 sale of its Allison Gas Turbine Division. Importantly, when GM calculated a segment closing adjustment under CAS 413, the relevant GM pension plans were under-funded. As such, GM calculated the government's share of the under-funding and submitted a claim for adjustment reflecting this calculation. The Defense Contract Audit Agency ("DCAA") audited the claim and asserted, among other things, that fixed-price contracts are excluded from the determination of the government's share of the liability. On January 19, 2000, the CO denied GM's claim, adopting the DCAA's position. GM filed its complaint in this suit on January 27, 2000, seeking $311,450,592 plus interest from the government under CAS 413 or as an equitable adjustment due to a mandatory "change in accounting practice" under 48 C.F.R. § 52.230–2(a)(4)(i) (1998).

On cross-motions for summary judgment, the parties presented their respective interpretations of both the original and the amended CAS 413 to the court. In a detailed and well reasoned eighty-eight page opinion, the Court of Federal Claims reached several conclusions and only those relating to the interpretation of the original CAS 413 are challenged on appeal. *Teledyne, Inc. v. United States,* 50 Fed. Cl. 155 (Fed.Cl.2001). The court first concluded that Teledyne's sale of TES to a third party was a "segment closing" under the terms of the original CAS 413. *Id.* at 170–71. The trial court also concluded that a contractor is not entitled to an equitable adjustment under 48 C.F.R. § 52.230–2(a)(4)(i) simply because a segment closing has occurred. *Id.* at 174–75. The court then turned its attention to the numerous arguments over the interpretation of the last sentence of CAS 413: "The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs."

With respect to that sentence, the court reached a series of related conclusions: (1) the adjustment extends to pension costs under all CAS contracts, *id.* at 172; (2)

---

**6.** Although, the CO alleged that the amended CAS 413 applied, the trial court held other- wise and that issue is not before us on appeal.

recoverability of that adjustment depends on the terms of the contract and therefore neither GM nor the government could recover those pension costs that flow to fixed-price contracts, *id.* at 172–74; (3) the amount of the adjustment that is recoverable depends on the contractor's proportion of fixed-price and flexibly-priced contracts under which the costs were paid—that is, the past mix of contracts controls, *id.* at 178–81; (4) the adjustment is effectuated in the current period, meaning it may be recovered under any flexibly-priced contract that remains open during the year of the segment closing, *id.* at 181–83; (5) a party can recover even though the contracts to which the pension costs were allocated are closed or have had indirect cost rates finalized, *id.* at 182–83; and (6) the government cannot recover that portion of a pension surplus arising from contributions made under contracts entered into before the effective date of CAS 413 or contributions made by employees. *Id.* at 183–85.

The positions of the parties on appeal are as follows. Teledyne appeals (1) the holding that its sale of TES was a segment closing and (2) the holding that recovery is had in the current period, even though contracts may be closed or have had final indirect cost rates calculated. GM appeals (1) the holding that recovery under CAS 413 depends on the contract terms under which the pension costs were paid and (2) the holding that upon a segment closing a contractor is not entitled to an equitable adjustment under the CAS clause, 48 C.F.R. § 52.230–2(a)(4)(i). The government cross appeals (1) the holding that the CAS 413 adjustment is based on the historical proportion of fixed- and flexibly-priced contracts and (2) the holding that the adjustment does not include surplus attributable to contributions under pre-

CAS contracts or employee contributions. We address each issue below in its logical order.

We have jurisdiction over these timely filed appeals pursuant to 28 U.S.C. §§ 1292(d)(2) and 1295(a)(3).

## DISCUSSION

■ We review *de novo* the Court of Federal Claims' partial grants of summary judgment. *Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995). When interpreting provisions of the CAS our task is "to ascertain the [Board's] intended meaning when it promulgated the CAS." *Perry v. Martin Marietta Corp.,* 47 F.3d 1134, 1137 (Fed.Cir.1995) (interpreting FAR 52.230–3 and 52.230–4 and the provisions of the CAS that those clauses incorporated). We accomplish this by first looking at the text of the relevant provisions and "any guidance that the [Board] has published to aid in interpretation." *Id.* at 1138. We examine the issues that follow through this interpretive lens.

### I

■ We turn first to the threshold issue of whether Teledyne's sale of the TES division was a "segment closing" under the original CAS 413. On appeal, as it did below, Teledyne asserts the sale was not a "segment closing" because the TES division continued to operate after it was sold. The trial court concluded otherwise, holding Teledyne's sale of TES was a "segment closing" because "Teledyne retained responsibility for the pensions, but not the contracts over which the gains and losses attributable to the government's share of pension costs would ordinarily be amortized." *Teledyne,* 50 Fed. Cl. at 170–71. For the reasons below, we agree with the trial court's holding.

Original CAS 413 does not define "segment closing" but does define "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office." 4 C.F.R. § 413.30(a)(11) (1986). Evidence of the Board's intent on the issue is, however, found both in the preamble to CAS 413 and in the examples in the regulation. The preamble, in relevant part, states:

> As a general rule, [CAS 413] ... is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.

4 C.F.R. pt. 413, pmbl. A. From this language, it follows that the Board intended the segment closing provision to apply in situations where "there are no future periods in which to adjust" the appropriate costs. *Id.* Thus, it applies to situations where, for whatever reason, the segment's contracts have become separated or closed off from the pension costs. By this reasoning, Teledyne's TES sale—in which it transferred the contracts, but retained the pension assets and liability—is just such a situation.

This conclusion is buttressed by the illustrations present in original CAS 413. Most relevant among them is illustration (c)(8), 4 C.F.R. § 413.60(c)(8) (1986). That illustration provides an example of the adjustment required upon the occurrence of a "segment closing." In illustration (c)(8) the government does not renew Contractor K's five-year contract to operate a government-owned facility. *Id.* Instead, a new contractor takes over the work and even hires some of Contractor K's employees. *Id.* The illustration notes, however, that "as far as Contractor K is concerned, the segment is closed." *Id.* Although there is no sale in this illustration and the contract is not transferred, the factual context is similar to that in the case at hand because someone will continue to perform the contract; it ends only with respect to that specific contractor, just as the TES segment did with respect to Teledyne.

Illustration (c)(5) also supports our conclusion. That illustration apparently provides an example of a situation that is not considered a "segment closing," as that provision is nowhere mentioned. *Id.* § 413.60(c)(5). That illustration is similar to Teledyne's situation in that a segment is transferred to another contractor who continues to perform the work. *Id.* There is a key distinction, however: the new segment owner takes on the pension responsibilities of the acquired segment. *Id.* Because of this distinction, there are "future periods in which to adjust previously-determined pension costs applicable to that segment." *Id.* pt. 413, pmbl. A.

We find unpersuasive Teledyne's plain language and regulatory history arguments. Most importantly, Teledyne's proposed construction would frustrate the undeniable purpose of the segment closing provision: to allow an adjustment where there will be no future periods in which to do so. For this reason and those stated above, we affirm the trial court's holding.

II

GM appeals the trial court's holding that a contractor is not entitled to an

equitable adjustment under the CAS contract clause, 48 C.F.R. § 52.230–2(a)(4)(i). The CAS contract clause requires a contractor to "comply with any CAS (or modifications to CAS) which hereafter become applicable to a contract or subcontract of the Contractor." 48 C.F.R § 9903.201–4(a)(3) (2000). Because the segment closing provision became applicable only upon the sale of its Allison division, GM argues this triggered the contract clause entitling GM to:

> an equitable adjustment as provided in the Changes clause of this contract if the contract cost is affected by a change which, pursuant to subparagraph (a)(3) [quoted above] of this clause, the Contractor is required to make to the Contractor's established cost accounting practices.

*Id.* § 9903.201–4(a)(4)(i). GM argues that expert testimony showed that compliance with the segment closing provision required GM to make cost accounting changes. Therefore, GM argues, it is entitled to the adjustment.

The trial court did not dispute that GM had to make changes, but merely held that these changes were not of the type this clause addressed. The court interpreted this portion of the regulation as applying only when the change occurs "as a result of the issuance of a new standard." *Teledyne,* 50 Fed. Cl. at 175 (quotation and citations omitted). The court noted that GM knew it was obliged to comply with the CAS when it entered into the contract, so the segment closing merely triggered a previously agreed-to method of calculation and adjustment. *Id.* We find this reasoning persuasive: GM's obligation to perform an adjustment on the segment closing was a preexisting contract requirement that arises whenever a segment closes.

We also do not accept GM's plain meaning argument. Subparagraph (a)(3), to which the CAS contract clause explicitly refers, has two parts. First, the contractor must "[c]omply with all CAS, including any modifications and interpretations indicated thereto ... in effect on the date of award of this contract." Second, the contractor must "comply with any CAS (or modifications to CAS) which hereafter become applicable to a contract or subcontract of the Contractor." 48 C.F.R. § 52.230–2(a)(3). The subparagraph, then, plainly has two tiers, one relating to existing regulations and a second dealing with subsequent changes. It is only this second tier that entitles the contractor to an equitable adjustment.

In addition, the purpose of the clause indicates that the trial court's reading of the regulation is the more reasonable interpretation. The purpose of the equitable adjustment clause is to prevent unfairness to the contractor that might arise if the government changes its accounting requirements. This purpose would not be served by applying the language to requirements in place at the time the contract is executed. In sum, for those reasons stated above and because we reject all other arguments raised on appeal, we affirm the trial court's holding that GM was not entitled to an equitable adjustment.

### III

The remaining issues on appeal all deal with the trial court's interpretation of the scope and allocation of the segment closing adjustment. We address these remaining issues in their logical order.

### A

GM appeals the trial court's holding that although CAS 413 applies to both

firm-fixed- and flexibly-priced contracts, whether any adjustment is recoverable depends on the terms of the particular contracts. *Teledyne,* 50 Fed. Cl. at 178. Specifically, GM appeals the court's ultimate holding that because, by their terms, firm-fixed-price contracts are not adjusted for changes in costs,[7] the portion of the adjustment attributable to those contracts is not recoverable unless another provision in those contracts expressly allows its recovery. On appeal GM argues that by its terms CAS 413 allows recovery of this portion of the adjustment, regardless of the contractual terms. To this end, GM asserts: (1) the text of the 1978 CAS 413 supports its interpretation; (2) contemporaneous documents indicate the Board interpreted the original CAS 413 to include fixed-price contracts; (3) the agency charged with applying CAS 413, the Department of Defense ("DOD"), interpreted the 1978 CAS 413 to include fixed-price contracts; and (4) the 1995 CAS 413 amendments putting fixed-price contracts within the scope of the adjustment only clarified the pre-existing standard and are therefore a binding interpretation. Because we find none of these arguments persuasive, we affirm the trial court's holdings.

### i. Text of the Original CAS 413.

The trial court concluded that by its terms CAS 413 applied to firm-fixed price contracts, but that the specific contractual provisions (and other FAR provisions) in those contracts prevented recovery of the adjustment from those contracts. *Teledyne,* 50 Fed. Cl. at 178. GM argues here that this result is contrary to the text of CAS 413 because that provision does not differentiate between different types of contracts (or even address individual contracts).

We are unpersuaded by GM's arguments. The preamble states that the standard applies to all "negotiated government contracts." Merely pointing to the absence of a differentiation as between fixed- and flexibly-priced contracts in the text does not say anything about whether contractual provisions control the recovery of the adjustment. We agree with the trial court's statement that, "[w]hether CAS 413.50(c)(12) by its terms also authorizes recovery of the surplus or deficit attributable to those contracts is a separate issue." *Id.* at 172.

### ii. Contemporaneous Evidence of the Board's Intent.

GM argues that Board staff documents written shortly after CAS 413 became effective demonstrate that the Board intended the adjustment attributable to firm-fixed price contracts to be recoverable. The trial court, however, concluded that "these documents are entitled to no weight." *Id.* at 174.

■ On appeal, GM renews its attack on this ground. With respect to the Sacks

---

7. FAR 16.202–1 states that a "firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience." 48 C.F.R. § 16.202–1 (2000); *see also, e.g., Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed. Cir.1996) ("Because fixed price contracts do not contain a method for varying the price of the contract in even unforeseen circum-

stances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract."). Flexibly-priced contracts, on the other hand, which contain the Allowable Cost and Payment Clause, FAR 52.216–7(h)(2), and the Credits Clause, FAR 31.201–5, expressly allow for adjustments based on differing cost experience.

memoranda, GM argues that even though only one person wrote the memoranda, the documents are sufficient to represent the intent of the entire Board. This person, Mr. Sacks, was an Associate Director of the Board, the primary drafter of CAS 413 and the Board's "point man" for dealing with requests for clarification of CAS 413 by entities that had to comply with the standard. In several meetings, Mr. Sacks advised entities that there would be apportionment between government and commercial contracts in a segment, but never indicated that an allocation between fixed- and flexibly-priced contracts was necessary. To further bolster the implications of Mr. Sacks' statements, GM also discusses the Board's practice at that time of monitoring other interpretations of the standard and correcting those that were erroneous. Because it was aware of Mr. Sacks' activities, it is argued, the Board's failure to correct his statements effectively serves as an endorsement or an adoption of his position.

GM also points to other contemporaneous evidence it claims shows that the Board did not view fixed-price contracts as non-adjustable. GM notes that the Board rejected a proposal in the late 1970s to treat fixed-price contracts differently under an accounting practice that was also encompassed by the CAS contract clause (excluding them from the equitable adjustment clause). After review, the Board "concluded that [firm fixed-price] contracts should continue to remain subject to the provisions of the CAS clause as currently contained in its regulations." 45 Fed.Reg. 8,677 (Feb. 8, 1980). Thus, GM concludes, the Board clearly viewed fixed-price contracts as subject to some adjustments.

We are not persuaded that any of this evidence compels GM's argued interpreta-

tion. Again, we are more persuaded by the trial court's reasoning. *Teledyne,* 50 Fed. Cl. at 174. These documents cannot represent the intent of the Board on this point. First, they are not the type of evidence discussed in *Perry,* 47 F.3d at 1137–38, because they were not published by the Board to aid the interpretation of CAS 413. Second, the statements by Mr. Sacks (only a staff member) are not statements by the Board, they are vague, and they were written at least nine months after the promulgation of CAS 413. Third, the Board's decision not to exclude fixed-price contracts from the equitable adjustment clause does not indicate that all adjustments will always be recoverable under fixed-price contracts. At most, the Board's statements accompanying the proposed rule only make clear that CASs apply to fixed-price contracts, as we have held.

### iii. Interpretations and Implementation by Other Agencies.

GM also notes that the agencies of the DOD had, until this litigation began in 1999, interpreted CAS 413.50(c)(12) as requiring the recovery of any surplus or deficit attributable to government pension contributions under fixed-price contracts. The trial court, however, was not persuaded by this argument. The court relied primarily on a 1993 report by the Office of the Inspector General of the DOD stating:

We also found there are disagreements between the DLA ["Defense Logistic Agency"] and the DCAA on how to implement the CAS 413.50(c)(12) provision for adjusting previously determined costs. The DCAA interprets the CAS 413 to require the contractor to account for all pension fund assets and liabilities related to a closed segment and to ad-

just previously determined pension costs allocated to all the CAS covered contracts. Support for that position is in the CAS contract clause at the FAR 52.230–3.... Instead of referring to the CAS contract clause, the DLA has accepted an adjustment in accordance with the credits provision in FAR 31.201–5 that results in cost recovery on cost type contracts only.

*Teledyne,* 50 Fed. Cl. at 168 (quoting Office of the Assistant Inspector General for Audit Policy and Oversight, Office of the Inspector General, Dept. of Defense, Rpt. on Dept. of Defense Oversight of Defense Contractor Pension Plans, No. APO 93–011, at 6 (May 7, 1993)); *see also id.* at 175. Because of this inconsistent application and because the CASs are not regulations of the DOD, the trial court found "no basis for giving deference to any of the DOD's interpretations." *Id.* at 176.

GM seeks to refute the trial court's views. First, GM disputes the idea that CAS 413 was inconsistently applied. There was testimony that the DOD had consistently applied CAS 413 until the policy change triggered by an adverse decision by the Armed Services Board of Contract Appeals ("ASBCA") in 1999. *Gould, Inc.,* ASBCA No. 46759, 97–2 BCA ¶ 29, 254 (Sept. 19, 1997) (rejecting the government's argument that the 1995 amendment merely clarified the meaning of the "segment closing" adjustment). Also, GM points out that the Defense Logistics Agency ("DLA") only accepted one settlement based on an adjustment to only flexibly-priced contracts. Further, in that case the DOD report quoted above criticized the DLA for settling only for "a fraction of the Government's interest." The report also recommended the DLA issue a guidance memorandum to the field to ensure

that the contracting officers fully "enforce the Government's rights under the cost principles." In this regard, GM argues it is untenable to assert that the DOD applied CAS 413 inconsistently based on one mistakenly settled claim by the DLA.

Second, GM argues the DOD's interpretations should be given deference—although not the "formal deference" owed to the Board, because the DOD is the agency "tasked with application and enforcement of the standard." In addition, GM asserts that the Board would have acted had it viewed the DOD's interpretation as erroneous.

■ We also find these arguments unpersuasive. As the trial court noted, only the interpretation of the agency that promulgated the regulation matters. *Perry,* 47 F.3d at 1137 (citing *Newport News Shipbuilding & Dry Dock Co. v. Sec'y of the Navy,* 6 F.3d 1547, 1551 (Fed.Cir.1993) (rejecting the contention that when the Department of the Navy interprets the FAR it is interpreting its own regulations)). In addition, because the Board that issued CAS 413 went out of existence in 1980, the subsequent DOD interpretations should be given no weight, because the Board could not have corrected them.

*iv. The 1995 CAS Amendments as a Binding Interpretation.*

The trial court held that the language of the amended CAS 413 clearly indicated that its inclusion of fixed-price contracts was a departure from the original. *Teledyne,* 50 Fed. Cl. at 176. As support the court pointed out that the amended CAS 413 contains a section setting forth the "transition method" for implementing the amended CAS 413:

All adjustments shall be prospective only. However, costs/prices of prior and

existing contracts not subject to price adjustment may be considered in determining the appropriate transition method or adjustment amount for the computation of costs/prices of contracts subject to this standard.

48 C.F.R. § 9904.413–64(e) (2000). The court first noted that the mere inclusion of such a "transition method" suggests the amendments effected a change. The court also stressed the importance of the explicit limit to prospective application, stating it "leads to the conclusion that the amended language was not intended by the original enactment." *Teledyne,* 50 Fed. Cl. at 177.

In addition, the court found the regulatory history persuasive. In the preamble to the final rule, the Board noted that "[f]ive commenters [to the publication of the proposed rule] opposed the inclusion of fixed-priced contracts." *Id.* The Board replied to these comments, but never stated that these were included in the original CAS 413. The court's final point was that the FAR was again amended in 1998 because there had been "substantial changes to CAS 412 and 413 relating to accounting for pension costs under negotiated Government contracts." *Id.* at 178. The court stated that these amendments would not have been necessary had fixed-price contracts always been subject to adjustment.

On appeal GM argues that the 1995 CAS 413 amendments merely represent the Board's interpretation of the original CAS 413 and thus the original CAS 413 must be interpreted in accordance with those amendments. As its primary support, GM quoted language in the amended CAS 413 stating that the provision on segment closings "clarifies, but is not intended to create, rights of the contracting parties." 48 C.F.R. § 9904.413–64(c) (2000). Thus, GM argues, the amendment did not create a right for contracting parties to recover adjustments on fixed-cost contracts, but rather only clarified that one already existed.

GM begins by asserting that the Board gave no indication that the Board was making significant changes to the segment closing rule. The notice of proposed rulemaking, the preamble, and the standard itself all state they were added to clarify or provide specificity to the prior standard. GM further notes that the provision in the standard stating that the amendments only clarify the original standard, CAS 413.64(c), only applies to the segment closing provision. GM also argues that CAS 413.64(c)'s reference to being applicable to "outstanding issues that will affect pension costs of contracts subject to this Standard" indicates that it was meant to apply to the original CAS 413, because these "outstanding issues" must have arisen under that provision.

Next, GM makes several arguments that the "transition provision" does not prove that the 1995 CAS changed the original CAS 413. GM argues that the "transition provision" in the amended CAS 413.64 does not show that the amendments effected a change. GM states the language "costs/prices of prior existing contracts" in the provision indicates that the Board was not focusing the transition on fixed-price contracts, because it included "costs" in the provision as well. GM concludes that the Board was referring to contracts that were not covered by the CAS. GM contends this is supported by the 1998 amendments to a FAR provision that explained how to make a segment closing adjustment on contracts that were not subject to the CAS.

These arguments do not persuade us. We find more persuasive the view of the

trial court, because it is illogical to say all the additional text of the amendment simply "clarified" rights that already existed, especially in light of the several clear changes made to the segment closing provision. Regardless, even if the amendments only clarify rights under the original CAS, it does not follow that the amendments merely interpret that provision. More specifically, allowing recovery under fixed-price contracts could be viewed as a clarification of the scope of recovery permitted under the standard, rather than a creation of any new adjustment. GM's position that the transition was meant to apply to non-CAS contracts rather than fixed-price contracts is also unpersuasive. The government rightly notes that there would be no need to transition with respect to these contracts, because they were not subject to the CAS, either before or after the 1995 amendments.

In sum, as we are not persuaded by any arguments presented on appeal, we affirm the trial court's holdings that the original CAS 413 applies to both fixed- and flexibly-priced contracts, but that whether any adjustment is recoverable depends on the terms of the particular contracts.

## B

The government cross-appeals the trial court's conclusion that the segment-closing adjustment was to be based on the historical proportion of fixed- and flexibly-priced contracts. The trial court reached this conclusion by focusing on the text and preamble of the original CAS 413, and because it concluded that a contrary interpretation would lead to inequities.

The government challenges the trial court's holding on several fronts. First, it contends that an inequitable result is just as likely under the court's interpretation. The government notes that if the contractor had only fixed-price contracts open in the period the segment was closed, there would be no recovery, because the terms of those contracts do not allow any recovery. Second, the government asserts that the plain language of CAS 413.50(c) compels the allocation of the entire adjustment, in the form of the full amount of the segment's pension surplus or deficit, to the period in which the segment is closed. This result is compelled by the last sentence of CAS 413.50(c)(12): "the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, represents an adjustment of previously determined costs." 4 C.F.R. § 413.50(c)(12) (1986). The court's approach, it is argued, only allows a lesser adjustment—the portion attributable to contributions paid by the government under flexibly-priced contracts entered into after the effective date of the original CAS.

The government's primary argument in rebuttal is that the Board intended the segment closing adjustment to be identical to the adjustment to continuing pensions, except for the lack of any amortization period where a segment is closed (because doing so is impossible). To this end, the government discusses the ongoing adjustment mechanism, noting it is a full adjustment to account for actuarial gains or losses in that year amortized in equal amounts over the next fifteen years. Id. § 413.50(a)(2). The government posits that the key to the Board's intent here is in its explanation of the requirement of uniform fifteen-year amortization. The Board explained that it did not adopt an immediate recognition because:

It is also consistent with Opinion No. 8 of the Accounting Principles Board

(APB–8). The Board believes that the amortization period set forth in ERISA is a reasonable basis for adjusting past pension cost accruals without creating significant distortions to current year accruals .... The Board believes there is no valid basis for immediate recognition of gains or losses simply because they are exceptionally large. Recognizing gains and losses in the current year generally is not appropriate because the gains or losses are often an adjustment of costs of a number of years. In this regard, the Board notes that APB–8 states also that gains and losses should be recognized immediately only if they arise from a single occurrence not directly related to the operation of the pension plan such as the closing of a plant.

*Id.* pt. 413, pmbl A. The government argues that this reasoning conclusively shows that the Board viewed the ongoing adjustments and the segment closing adjustment as the same, except that the segment closing adjustment could not be amortized. The government's penultimate conclusion here is that the Board must have intended that "[t]he difference between the market value of the assets and the actuarial liability for the segment [the full adjustment referenced above] represent[ ] an adjustment of previously determined pension costs." *Id.* § 413.50(c)(12).

The government also attacks the trial court's conclusion that the Board intentionally elected to treat a segment closing adjustment differently, pointing to the preamble's statement that the adjustment "is not an actuarial gain or loss as defined in the Standard." *Teledyne,* 50 Fed. Cl. at 181. The government argues that this statement means only that the segment closing adjustment is not made by amortizing it over 15 years.

■ Once again, we are unpersuaded. The text expressly refers to an adjustment of "previously determined pension costs" suggesting that the adjustment would represent the costs actually paid by the government. 4 C.F.R. § 413.50(c)(12) (1986). This is supported by illustration (c)(8) (accompanying 413.50(c)(12)), which states the adjustment amount "indicates the extent to which the government over-contributed to the pension plan for the segment, and, accordingly, indicates the extent to which prior years' pension costs are subject to adjustment." *Id.* § 413.60(c)(8). The preamble further supports this view, stating the segment closing "is not an actuarial gain or loss as defined in the standard" and that the "Board emphasizes that the purpose of this provision is to serve as a basis for recognizing and adjusting costs previously allocated to the segment being terminated." *Id.* pt. 413, pmbl A. From these three indicators, we, like the trial court, conclude that "the purpose of the CAS 413 segment closing adjustment is to identify where the government may have over or under contributed to pension costs under prior contracts." *Teledyne,* 50 Fed. Cl. at 180. In addition, as a matter of logic and equity, it makes no sense to look at whatever mix of contracts the contractor happened to have open with the government in the year of the segment closing.

C

■ Teledyne appeals the trial court's holding that the adjustment attributable to flexibly-priced contracts must be allocated in the year of the segment's sale rather than to the contracts under which the pension costs were actually reimbursed. Teledyne also appeals the court's resulting conclusion that the adjustment provides

recovery of costs allocated to contracts that were closed without assignment of refunds, rebates, and credits or where a final indirect cost rate was calculated. The trial court based its conclusion that the adjustment must be allocated to the current period on "the words of CAS 413 and established contract principles." *Id.* at 181.

As to the text, the court focused on the following:

> The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the *date of the event (e.g., contract termination) that caused the closing of the segment.* If such date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date .... [this calculation] represents an adjustment of previously determined pension costs.

4 C.F.R. § 413.50(c)(12) (1986) (emphasis added). The trial court viewed the emphasized language as clearly indicating that a current period adjustment is to be made. Further, the court stated that "represents" indicates that CAS 413 does not call for an actual adjustment, rather only one that identifies a potential credit or cost to be paid at the segment's closing. *Teledyne,* 50 Fed.Cl. at 182. Because it concluded a

current period adjustment was required, the court also concluded that the adjustment was governed by the terms of the allowable cost and payment clause, and the credits clause in contracts open in the current period. *Id.*

On appeal, Teledyne argues that the trial court misread the text of CAS 413(c)(12). Namely, Teledyne asserts that the text relied on by the trial court does not compel the adjustment to be applied at the same time as the triggering event, the segment closing. Teledyne also argues that the trial court put too much weight on the term "represents" in the language in CAS 413(c)(12). Teledyne contends that the trial court's reading of "represents"— to mean an actual adjustment of the original pension cost was not required—is in conflict with example CAS 413.60(c)(8), which concludes that the amount of the pension cost adjustment "indicates the extent to which prior years' pension costs are subject to adjustment." From this statement, Teledyne concludes that the Board did intend pension costs to be adjusted.[8]

However, Teledyne's arguments say nothing about the Board's intent. Moreover, an adjustment of previously-determined costs can be made not only by an adjustment to prior period costs and cost accounts, but also by a current period adjustment. We think it more likely that the

---

**8.** Teledyne also argues that the trial court's holding is inconsistent with two prior decisions dealing with government claims to share in the reversion of funds resulting from the contractor's termination of over-funded pensions. In *NI Industries,* ASBCA No. 34943, 92–1 B.C.A. ¶ 24,631 (Nov. 29, 1991), the ASBCA held the Credits provision gave the government a right to funds only to the extent those funds were attributable to payments made under the various contracts. In *ITT Federal Support Services, Inc. v. United States,* 209 Ct.Cl. 157, 531 F.2d 522 (1976),

the Court of Claims affirmed an ASBCA that the government was entitled only to a pro rata share of the surplus attributable to contracts for which the contractor had executed an assignment of refunds, rebates, and credits. Thus, Teledyne argues, these cases would not allow recovery under contracts that are no longer subject to adjustment. The trial court did not address these cases in its opinion, and the government rightly argues on appeal that those cases did not address the Board's intent in promulgating CAS 413.

Board intended the latter because it expressly provided for current period adjustment of every other similar cost. *See, e.g.,* 4 C.F.R. § 409 (recorded depreciation cost) and § 415 (compensation cost upon forfeiture of deferred compensation). In addition, the preamble stated that "immediate recognition" was appropriate only for gains and losses that arose "from a single occurrence not directly related to the operation of the pension plan such as a closing of a plant" and that the "Standard is consistent with this concept." 4 C.F.R. pt. 413, Pmbl. A. Further, prior period adjustments are used under Generally Accepted Accounting Principles only to correct errors, rather than to make changes in estimates, as is done here.

Based on this conclusion, we also reject Teledyne's arguments regarding the specifics of contracts that were closed without assignment of refunds, rebates, and credits or where there was a final indirect cost rate calculation done. As the trial court concluded, it is only the status of current period contracts that matters. Therefore, the status of past contracts is irrelevant. In any event, following Teledyne's approach would eviscerate the requirements of the mandatory Allowable Cost and Payment clause that require the contractor to pay all allocable credits to the government while the contract is open. FAR 52.216–7(h)(2). Importantly, the clause also requires that the contractor execute an assignment of all future credits to the government. *Id.* Thus, Teledyne's reading would frustrate the clause's purpose of insuring all rightly allocable credits be paid to the government, regardless of when they accrue.

## D

The government cross-appeals the trial court's conclusion that the segment closing adjustment should not include surplus attributable to pre-CAS contracts or employee contributions. The government, along with reiterating its argument that the trial court misconceived the purpose of CAS 413, raises several specific points to refute the trial court's conclusion that pre-CAS contracts are not subject to the adjustment. First, the government notes that while the Board specifically denoted that other provisions are prospective only, it made no such mention with regard to the segment closing provision. Second, the government argues applying CAS 413 to pre-CAS contracts would not be prospective, because it is simply applying the terms after they have become effective. Third, because the trial court concluded the adjustment was to be made in the current period, it cannot be an adjustment to prior costs triggering the equitable adjustment clause. Thus, because the entry is made in the current period, when the contractor is subject to CAS 413, and the adjusting entry does not increase or decrease the pension cost previously allocated, there can be no government mandated change to trigger the equitable adjustment clause.

 Again, we find the trial court's reasoning more persuasive than any argument presented on appeal. The trial court had two reasons for concluding pre-CAS contracts were not subject to adjustment. First, the terms of CAS 413 and the statute creating and empowering the Board mandate that CAS 413 be prospective in application. *Teledyne,* 50 Fed. Cl. at 183. Second, were it to be otherwise, applying CAS 413 to these contracts would amount to a change in accounting practices subject to equitable adjustment under the CAS Clause, 48 C.F.R. § 52.230–2(a)(4)(i). *Id.* at 184. In concluding that the government

is only entitled to recover the amounts attributable to its pension contributions, the court noted that the principal purpose of the allowable cost clause is to reimburse the government. *Id.* The court then turned to case law (albeit non-binding case law), concluding it was well settled that the government is only entitled to refunds of costs it actually reimbursed. *Id.* Because we find this reasoning persuasive, we affirm the trial court's holding.

## CONCLUSION

For the reasons stated above, we affirm the trial court on all points raised on appeal.

*AFFIRMED.*