# United States Court of Appeals for the Federal Circuit

---

**THE DIRECTV GROUP, INC.,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5031

---

Appeal from the United States Court of Federal Claims in case no. 04-CV-1414, Judge Nancy B. Firestone.

---

Decided: January 26, 2012

---

ALEXANDER F. WILES, Irell & Manella LLP, of Los Angeles, California, argued for the plaintiff-appellee. With him on the brief was ADAM J. FLETCHER. Of counsel on the brief was ALAN C. BROWN, Enterprise Business Law Group LLC, of McLean, Virginia.

C. COLEMAN BIRD, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for the defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KIRK T. MANHARDT, Assistant Director. Of coun-

sel on the brief was LAWRENCE S. RABYNE, Defense Contract Management Agency, of Arlington Heights, Illinois.

RICHARD D. BERNSTEIN, Willkie Farr & Gallagher LLP, of Washington, DC, for amicus curiae. With him on the brief were ANTONIO YANEZ, JR. and FRANK M. SCADUTO. Of counsel on the brief were CARTER G. PHILLIPS and HOWARD STANISLAWSKI, Sidley Austin LLP, of Washington, DC.

---

Before NEWMAN, GAJARSA[1], and MOORE, *Circuit Judges*.

Opinion for the court filed PER CURIAM. Opinion dissenting-in-part filed by *Circuit Judge* GAJARSA.

PER CURIAM.

At issue in this appeal are the calculation and payment of segment closing adjustments associated with the sale of certain business units by DIRECTV Group, Inc. ("DIRECTV"). The United States ("Government") appeals the decision of the United States Court of Federal Claims in *DIRECTV Group, Inc. v. United States*, 89 Fed. Cl. 302 (2009), granting summary judgment in favor of DIRECTV. For the reasons stated below, we affirm.

## BACKGROUND

This appeal relates to the application of particular accounting regulations when a segment of a company is sold and the sale includes the transfer of defined benefit pension plans. A defined benefit pension plan is "a pension plan in which the benefits to be paid, or the basis for determining such benefits, are established in advance and

---

[1] Circuit Judge Gajarsa assumed senior status on July 31, 2011.

the contributions are intended to provide the stated benefits." 48 C.F.R. § 31.001 (2010). In simple terms:

> Defined-benefit plans guarantee fixed payments to retired employees, leaving the company responsible for ensuring that sufficient funds will be available. Companies therefore must make assumptions regarding, *inter alia*, the amount of money they expect to pay in the future, and the expected performance of the investments held by their pension plans. Based on these assumptions, companies determine how much money to invest in the plan in a given period so that future liabilities will be met.

*Gates v. Raytheon Co.*, 584 F.3d 1062, 1064 (Fed. Cir. 2009).

In the case of cost-type Government contracts, the contributions made on behalf of covered employees are paid by the Government as a part of the cost of the contracts. *Id.* Like contributions made by the employer-contractor, the amount of the Government's contributions to the plan depends on actuarial assumptions regarding mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets, etc. *See* 4 C.F.R. § 413.30(a)(1) (1978). The differences between these *ex ante* assumptions and actual experience translate into actuarial gains and losses. *Id.* § 413.30(a)(3).

To achieve uniformity and consistency in the accounting principles followed by Government contractors, Congress authorized the Cost Accounting Standards Board "to make, promulgate, amend, and rescind cost accounting standards and interpretations thereof . . . ." 41 U.S.C. § 422(f)(1). One of these standards, Original Cost Accounting Standard ("CAS") 413.50, regulated the assign-

ment of actuarial gains and losses, the valuation of the assets of a pension fund, and the allocation of pension costs to a contractor's various business segments.[2] 4 C.F.R. § 413.50 (1978). To prevent volatility in the amounts of pension costs charged to the Government, that standard also required certain pension plans to amortize actuarial gains and losses over a fifteen year period. *Id.*

This amortized adjustment process fails, however, when the segment is closed, i.e., whenever "the segment's contracts have become separated or closed off from the pension costs" such that "there are no future periods in which to adjust . . . [the] pension costs." *Allegheny Teledyne, Inc. v. United States*, 316 F.3d 1366, 1374 (Fed. Cir. 2003) (internal quotation omitted). In such a case, the contractor is required to "determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment," with the difference representing "an adjustment of previously

---

[2] To be precise, Congress empowered a "Cost-Accounting Standards Board" to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Act to Amend the Defense Production Act of 1950, Pub. L. No. 91-379, 84 Stat. 796 (1970) (codified at 50 U.S.C. § 2168 (repealed 1988)). It was this Cost-Accounting Standards Board that initially promulgated Original CAS 413. *See* Recodification of Cost Accounting Standards Board Rules and Regulations, 57 Fed. Reg. 14148 (Apr. 17, 1992). In 1988, Congress authorized a new "Cost Accounting Standards Board" within the Office of the Federal Procurement Policy. Act to Amend and Extend the Office of Federal Procurement Policy Act, Pub. L. No. 100-679, 102 Stat. 4055, 4059-60 (1988) (codified at 41 U.S.C. § 422). The cost accounting standards promulgated by the original Board were recodified by the new Board, 57 Fed. Reg. at 14148, and are found as amended in Title 48 of the Code of Federal Regulations.

determined pension costs." 4 C.F.R. § 413.50(c)(12) (1978). This difference is a "segment closing adjustment" to be applied to the contract cost. In short, the Government and contractor terminate the amortization and adjust the outstanding pension obligations by allocating any then-existing surplus or deficiency between them.

At issue are segment closing adjustments resulting from DIRECTV's sale of two segments. The first segment closing occurred on December 17, 1997, when DIRECTV (formerly, Hughes Electronics Corporation) completed a spin-off of its defense business units and sold those units to Raytheon Company ("Raytheon"). In connection with the Raytheon transaction, the parties stipulated that DIRECTV transferred to Raytheon $5,774,655,148 in pension assets and $3,310,028,559 in pension liabilities, resulting in a net transfer of $2,464,626,589 in surplus pension assets associated with the transferred segment. The second segment closing occurred on October 6, 2000, when DIRECTV sold its satellite business units to The Boeing Company ("Boeing"). In connection with that transaction, the parties stipulated that DIRECTV transferred to Boeing $1,843,930,981 in pension assets and $1,037,344,156 in pension liabilities, resulting in a net transfer of $806,586,825 in surplus pension assets associated with the transferred segment. In both transactions, DIRECTV retained a relatively small portion of the surplus pension assets.

By letters dated August 2, 2001, and October 6, 2003, the Government notified DIRECTV of its initial findings that DIRECTV was in noncompliance with CAS 413.50(c)(12) based on the Raytheon and Boeing transactions, respectively. In each case, DIRECTV responded with a segment closing calculation, along with a claim for an interpretation of contract terms under the Contract Disputes Act of 1978. The Government issued a Contract-

ing Officer's Final Decision and Demand for Payment regarding the Raytheon transaction on December 12, 2003, in which it again asserted noncompliance with CAS 413.50(c)(12) and demanded payment of $68,695,891 based on the Government's estimate of the segment closing adjustment. A similar decision regarding the Boeing transaction was issued on June 14, 2005, once again asserting noncompliance with CAS 413.50(c)(12) and demanding payment of $12,197,704.

To resolve the dispute, DIRECTV brought suit against the Government in the United States Court of Federal Claims. In its complaint, DIRECTV alleged that no segment closing adjustments were required because it transferred all of the pension plan assets and liabilities at issue to Raytheon and Boeing. Compl. ¶¶ 39, 52. DIRECTV therefore requested that the court "declare that DIRECTV's cost accounting practices are in compliance with CAS 413 or, alternatively, that any noncompliance has not resulted in increased costs paid by the United States" and that DIRECTV has no liability for any segment closing adjustment in connection with the Raytheon and Boeing transactions. Compl. at 20-21. Substantively identical requests for relief were made by DIRECTV in its Second Amended Complaint. The Government then filed counterclaims for payment of the segment closing adjustments at issue.

The trial court granted DIRECTV's summary judgment motion. Applying the same interpretation promulgated in *General Electric Co. v. United States*, 84 Fed. Cl. 129 (2008) ("*GE II*"), the trial court concluded that Original CAS 413 mandated that any segment closing adjustment was to be calculated based on the assets and liabilities of the entire segment, including those transferred to the buyer of the segment. *DIRECTV*, 89 Fed. Cl. at 306-08. The trial court rejected the Government's

argument that, absent an express agreement with the Government, DIRECTV could not satisfy its CAS 413 closing adjustment through cost reductions attributable to the segment buyers. More specifically, the trial court found that neither the Allowable Cost and Payment clause, 48 C.F.R. § 52.216-7(h)(2), nor the Credits provision, 48 C.F.R. § 31.201-5, of the Federal Acquisition Regulation ("FAR") prohibited DIRECTV from taking credit for cost reductions attributable to Boeing and Raytheon. *Id.* at 308-09.

The Government conceded in its summary judgment brief that if the segment closing adjustments were calculated in accordance with the logic expressed in *GE II*, the transfers made by DIRECTV to Raytheon and Boeing resulted in benefits to the Government—in the form of cost reductions on contracts held by the transferees—greater than the amount DIRECTV owed the Government following the segment closings. *Id.* at 307. The trial court also determined that the CAS authorizing legislation, 41 U.S.C. § 422(h)(3), prohibited a windfall to the Government, as would occur if DIRECTV were required to make a direct payment to the Government in addition to the cost reductions already provided by Raytheon and Boeing based on the transfer of surplus pension assets. *Id.* at 310. In short, the trial court concluded that the Allowable Cost and Payment clause and the Credits provision did not prohibit DIRECTV from satisfying its segment closing adjustment obligations via cost reductions attributable to Raytheon and Boeing.

The Court of Federal Claims had jurisdiction over DIRECTV's complaint pursuant to 41 U.S.C. § 609(a), and over the Government's counterclaims pursuant to 28 U.S.C. §§ 1503 and 2508. Final judgment was entered on October 16, 2009. This court has jurisdiction over the

Government's timely appeal pursuant to 28 U.S.C. § 1295(a)(3).

STANDARD OF REVIEW

This court reviews de novo a grant of summary judgment by the Court of Federal Claims. *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1370 (Fed. Cir. 2009). "A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). In determining whether there are genuine issues as to material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As issues of law, we review without deference the Court of Federal Claims's interpretation of statutes, the CAS, and the FAR. *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1321 (Fed. Cir. 2007); *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003); *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986).

DISCUSSION

The Government raises two issues on appeal. First, the Government argues that the trial court erred by calculating segment closing adjustments based on the assets and liabilities of the entire segment, rather than only the assets and liabilities that DIRECTV retained. Second, the Government argues that the FAR required DIRECTV itself to pay any amount due as a segment closing adjustment, and that cost reductions provided by successor contractors are not an acceptable form of payment.

I.

We turn to the Government's first argument that the trial court erred in calculating segment closing adjustments based on the surplus pension assets of an entire segment, rather than just those assets retained by DIRECTV. *See DIRECTV*, 89 Fed. Cl. at 305 (citing *GE II*, 84 Fed. Cl. at 131). Original CAS 413.50(c)(12), the regulatory authority on which the segment closing adjustments at issue are based, uses the word "segment" nine times:

> If a ***segment*** is closed, the contractor shall determine the difference between the actuarial liability for the ***segment*** and the market value of the assets allocated to the ***segment***, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the ***segment***, if the contractor has not already allocated assets to the ***segment***, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the ***segment*** shall be the ***segment's*** proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the ***segment***. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the ***segment*** represents an

> adjustment of previously-determined pension costs.

4 C.F.R. 413.50(c)(12) (1978) (emphases added). Other than the introductory phrase, which triggers application of the provision "if a segment is closed," each use of the word "segment" is preceded by the definite article "the," and none is modified by language suggesting less than a full segment. *See id.* Such is the case with the operative language: "The difference between the market value of the assets and the actuarial liability for ***the segment*** represents an adjustment . . . ." *Id.* (emphasis added). This use of a definite article, without other limitation as to quantity, necessarily describes an entire segment. *See Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). We therefore conclude that Original CAS 413.50(c)(12) requires a segment closing adjustment based on the applicable assets and liabilities of the entire segment at issue.

Subsequent changes to CAS 413 support this conclusion. In 1995, the Board substantially amended Original CAS 413. *See* Cost Accounting Standards, 60 Fed. Reg. 16,534 (Mar. 30, 1995) (codified at 48 C.F.R. pts. 9903, 9904 (1996)). Among the changes was the addition of a provision governing partial transfers of pension assets and liabilities:

> If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actual accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. *If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are trans-*

*ferred, then the adjustment amount required un-
der this paragraph (c)(12) shall be determined
based on the pension plan assets and actuarial ac-
crued liabilities remaining with the contractor.* In
either case, the effect of the transferred assets and
liabilities is carried forward and recognized in the
accounting for pension cost at the successor con-
tractor.

*Id.* at 16,552 (codified at 48 C.F.R. § 9904.413-50(c)(12)(v)
(1996)) (emphasis added). Thus, rather than requiring an
adjustment based on "the assets and the actuarial liabil-
ity for the *segment*," 4 C.F.R. 413.50(c)(12) (1978) (empha-
sis added), Revised CAS 413 requires that the adjustment
be "based on the pension plan assets and actuarial ac-
crued liabilities *remaining with the contractor*," 48 C.F.R.
§ 9904.413-50(c)(12)(v) (1996) (emphasis added). We
presume that when the Board acted to make this change,
it meant for the amendment to have real and substantial
effect. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When
Congress acts to amend a statute, we presume it intends
its amendment to have real and substantial effect.").

In *Allegheny Teledyne*, 316 F.3d at 1380, we found it
"illogical to say all the additional text of the [1995]
amendment simply 'clarified' rights that already existed,
especially in light of the several clear changes made to the
segment closing provision." We see no reason to deviate
from that conclusion here. Accordingly, we affirm the
trial court's conclusion that Original CAS 413.50(c)(12)
requires the segment closing adjustment to be based on
the applicable assets and liabilities of the entire segment.

## II.

Having determined the pool of assets and liabilities on
which the segment closing adjustment is based, we turn
next to how a surplus, if any, may be recouped by the

Government. Although the CAS governs allocability, i.e., what portions of a cost are assigned to a particular segment or contract, the FAR generally governs whether a party may apply or recover that cost. *See, e.g.*, *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1280-81 (Fed. Cir. 2002). On appeal, the Government claims that certain FAR provisions—the Allowable Cost and Payment clause, 48 C.F.R. § 52.216-7(h)(2), and the Credits provision, 48 C.F.R. § 31.201-5—prohibit DIRECTV from satisfying its liability for segment closing adjustments via cost reductions attributable to the pension assets transferred to Raytheon and Boeing as successor contractors.

Since its promulgation in 1983, the Allowable Cost and Payment clause has provided, in relevant part:

> The Contractor shall pay to the Government any refunds, rebates, credits, or other amounts (including interest, if any) accruing to or received by the Contractor or any assignee under this contract, to the extent that those amounts are properly allocable to costs for which the Contractor has been reimbursed by the Government.

48 C.F.R. § 52.216-7(h)(2) (2010); *see also* Establishing the Federal Acquisition Regulation, 48 Fed. Reg. 42102, 42512 (Sept. 19, 1983). This clause must be inserted in all cost-reimbursement contracts. 48 C.F.R. § 16.307(a)(1) (2010). The clause requires "the Contractor," in this case DIRECTV, to pay the Government any amount owed. That obligation is implemented by the Credits provision, 48 C.F.R. § 31.201-5, which governs the acceptable forms of payment. *See Allegheny Teledyne*, 316 F.3d at 1370 n.4. The Credits Clause, 48 C.F.R. § 31.201-5, states:

> The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor

shall be credited to the Government either as a cost reduction or by cash refund. See 31.205-6(j)(4) for rules related to refund or credit to the Government upon termination of an overfunded defined-benefit pension plan.

The Government argues that the original contractor, DIRECTV in this case, must pay by "cost reduction or by cash refund" that originates with DIRECTV, not a successor contractor. It argues that a "refund" can only necessarily be of amounts paid to DIRECTV, or it would not be a refund. Therefore, it contends that any cost reduction must also come directly from DIRECTV because the terms "refund" and "reduction" are used interchangeably in the Credits Clause. The Government also notes that the Credits Clause refers to 48 C.F.R. § 31.205-6(j)(4) which requires the contractor that terminates a pension plan to make a payment directly to the Government. The Government further argues that the Allowable Cost and Payment Clause of the FAR also applies to the DIRECTV contract and requires that "the Contractor shall pay to the Government any refunds . . ." 48 C.F.R. § 52.216-7(h)(2) (1998). It argues that the Court of Federal Claims' interpretation of the Credits Clause contradicts the plain meaning of this provision.

DIRECTV responds that the Credits Clause does not preclude use of cost savings from a successor contractor to pay a segment closing adjustment. It argues that the words "refund" and "cost reduction" are separated by an "or" in the Credits Clause and that even if a refund would have to come from the original contractor, a cost reduction does not. It contends that the reference to § 31.205-6(j)(4) is irrelevant because it refers to termination of a pension plan. The pension plan was *not terminated*; it was transferred to a successor contractor.

We agree with the Court of Federal Claims that DIRECTV may rely on the cost reductions to the Government that occurred based on DIRECTV's transfer of pension assets to successor contractors. We are not persuaded by the Government's argument that the mention of the word "refund" in the Credits Clause requires that all payment come directly from the original contractor, DIRECTV in this case. The Credits Clause allows for repayment by either "a cost reduction or a cash refund." Even if the word "refund" is limited only to payment by the originally paid contractor—an issue we do not decide—this case is about a "cost reduction." There is nothing in the language of the Credits Clause that requires this "cost reduction" to be so limited. In the instant case, DIRECTV transferred pension assets to successor contractors that allowed the Government to reap the benefits it was entitled to had the transfer never taken place. This is certainly a cost reduction. As the obligated contractor, DIRECTV caused these cost reductions by transferring the pension assets. The Government cannot collect the segment closing adjustment for a second time simply because these cost reductions occurred as part of a successor contract. This type of payment is allowed by the plain language of the Credits Clause. Thus, we hold that the Credits Clause allows for payment by way of cost reductions that occur due to the transfer of pension assets to a successor contractor.[3]

---

[3] The dissent is incorrect in its dramatic assertion that we create a "continuous vortex where the Government can be forced to recover its increased costs from any person." Dissent at 8. The cost reductions in this case are the direct result of DIRECTV's transfer of the pension assets. The pension continued as if there was never any change in contractors. We are not holding that any cost reductions unrelated to the original contractor and the pension transfer could be used to satisfy the debts.

The Government does not dispute that because of the transfer of pension asset surpluses from DIRECTV to Raytheon and Boeing, the Government received more savings from the successor contracts than DIRECTV would owe the Government absent such transfer. *DIRECTV*, 89 Fed. Cl. at 307. The Government does not adequately explain how its proposal for additional payment from DIRECTV avoids providing a prohibited windfall to the Government. The Court of Federal Claims correctly held that such a windfall is prohibited by the CAS statute. *See* 41 U.S.C. § 422(h)(3) ("In no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government."); *GE II*, 84 Fed. Cl. at 148.

The trial court correctly concluded that under the circumstances here, "where the undisputed evidence demonstrates that the Government received the value of DIRECTV's CAS 413 segment closing obligation through a cost reduction from the successor contractors, the existence of a Government agreement in which the Government protected its interest in the pension asset surplus through a novation agreement or other means is not material." *DIRECTV*, 90 Fed. Cl. at 311. The Credits Clause cannot require double payment. *See id.* at 309. The CAS regulations further support the trial court's holding, stating that the Government may recover its segment closing adjustment through "any . . . suitable technique." 48 C.F.R. § 9903.306(f).

We are not persuaded by the Government's arguments regarding the second sentence of the Credits Clause which states "[s]ee 31.205-6(j)(4) for rules related

to refund or credit to the Government upon termination of an overfunded defined-benefit pension plan." The facts of this case do not amount to a "termination" of a pension plan. This is a transfer and, thus, the rules regarding termination do not apply. If a contractor truly terminates a pension plan, then it is clear that only that contractor can pay any closing adjustment—there are no future periods with a successor contractor for the Government to reap the rewards of any surplus. However, when a contractor transfers a pension, the Government continues to collect the benefits that it was entitled to had the pension never changed hands. Thus, the rules regarding pension "termination" are irrelevant to our analysis and the Court of Federal Claims was correct to hold that the Credits Clause allows payment of the segment closing adjustment through cost reductions that are the direct result of the transfer of pension surplus assets to a successor contractor.[4]

Strangely, the dissent in a complex web of interpretation reaches a result that neither party advocates. It performs an exhaustive historical analysis of the Credits Clause to arrive at a result that the Government—the beneficiary of the dissent's proposed resolution—calls "absurd." Appellant's Br. 58. Under the logic of the dissent, any retained pension asset amounts to a "termination" of the pension under 48 C.F.R. § 31.205-6(j)(4). This means that if DIRECTV retained $1.00 of a $1B pension, then the pension has been "terminated" and that

---

[4]    Contrary to the protests of the dissent, our decision in this section does not contradict the logic of Section I of this opinion. Dissent at 6. In Section I, we determined that the term "segment" means a single segment, not a portion of a segment. In this section, we hold that the reference to "contractor" may refer to a subsequent contractor if a pension is transferred. These are two logically and grammatically distinct inquiries.

the relevant regulations require that refunds be paid by DIRECTV alone. Based on our analysis in Section I, unless the Government expressly agreed to the transfer of the other $999,999,999.00, DIRECTV would be liable for a segment closing adjustment on the full $1B, even though the subsequent contractor continued the pension with all future amortized adjustments. In this case, for example, the dissent's construction would lead to double recovery by the Government of $273M—once in the form of a segment closing adjustment and again in the amortized adjustments by the subsequent contractor. It is not surprising that neither party requests this outrageous result.

The Court of Federal Claims correctly determined that DIRECTV's segment closing obligations could be satisfied by the cost savings realized by the Government in the successor contracts. Further, the Government concedes that, under this analysis, it is not entitled any further payments. *DIRECTV*, 89 Fed. Cl. at 307. Thus, we affirm.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**THE DIRECTV GROUP, INC.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5031

---

Appeal from the United States Court of Federal Claims in case no. 04-CV-1414, Judge Nancy B. Firestone.

---

GAJARSA, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I join Part I of the majority opinion with the understanding that Original CAS 413.50 is applied pursuant to a stipulation by the parties. Unfortunately, the majority fails to apply the appropriate textual interpretation of the statute and regulations at issue in Part II. The majority thereby obtains an outcome-driven result that is contrary to the CASB authorizing legislation and the FAR, is contrary to Supreme Court precedent regarding the interpretation of statutory and regulatory texts, and is not supported by the factual record. The majority is complicating the legal analysis. The issue is rather straightforward. Namely, when the United States has contributed to a surplus of a defined benefit plan, does it

have a right and discretion to determine how it can claim the overpayment? From this latest installment of the misnamed "national policy of fairness to contractors," *England v. Contel Adv. Sys., Inc.*, 384 F.3d 1372, 1383 (Fed. Cir. 2004) (Newman, J., dissenting), I respectfully dissent.

In my judgment, the majority makes three fundamental errors in Part II of its opinion. First, the majority fails to interpret the regulations at issue in light of the CASB authorizing legislation, 41 U.S.C. § 422, which requires that contract price adjustments "be made, where applicable, on *relevant contracts* between the United States and *the contractor*." (emphasis added). The simple and straight-forward import of that language is that cost adjustments must be made on contracts between the Government and the contractor who overcharged the Government, i.e. DIRECTV. Moreover, the requirement that the adjustment be made on "relevant contracts" raises a factual question that cannot be resolved on the record before us and, therefore, remand is appropriate. Second, to the degree that Section 422(h) is ambiguous, the majority selectively misreads interpretive regulations that give discretion in the manner of recognizing cost impacts but that explicitly require the Government and the contractor to agree on the manner selected. *See* 48 C.F.R. § 9903.306. Instead of forcing the Government to accept a cost reduction from third parties, it should be given the opportunity to determine whether it should obtain a refund from the contractors. Although the Government admits that it will benefit from lower pension payments in the future under the majority's holding, it should be the Government's determination what compensation it receives when a segment is closed. Finally, the majority ignores changes to the Credits provision, 48 C.F.R. § 31.201-5, as well as the plain text of 48 C.F.R.

§ 31.205-6(j)(4), both of which shed important light on who may provide the cost reductions at issue. I treat each of these errors in turn.

## I.

This case implicates two provisions of the CASB authorizing legislation. Section 422(h)(1) requires that contractors agree to a "contract price adjustment" when, as is the case here, they change their cost accounting practices or fail to comply with the standards promulgated by the Board:

> The Board shall promulgate rules and regulations for the implementation of cost accounting standards promulgated or interpreted under subsection (f) of this section. Such regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the United States to . . . (B) *agree to a contract price adjustment, with interest, for any increased costs paid to such contractor or subcontractor by the United States* by reason of a change in the contractor's or subcontractor's cost accounting practices or by reason of a failure by the contractor or subcontractor to comply with applicable cost accounting standards.

41 U.S.C. § 422(h)(1) (emphasis added).[1] The contract price adjustment is limited, however, by Section 422(h)(3), which states:

---

[1] While this appeal was pending, 41 U.S.C § 422 was repealed and recodified. *See* Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3695-700. 41 U.S.C. § 422(h)(1) was recodified with minor changes in phraseology at 41 U.S.C. § 1502(f)(2). The changes were not

> *Any contract price adjustment undertaken pursuant to paragraph (1)(B) shall be made, where applicable, on relevant contracts between the United States and the contractor* that are subject to the cost accounting standards so as to protect the United States from payment, in the aggregate, of increased costs (as defined by the Board). *In no case shall the Government recover costs greater than the increased cost (as defined by the Board) to the Government, in the aggregate, on the relevant contracts subject to the price adjustment,* unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.

*Id.* § 422(h)(3) (emphases added).[2]

In interpreting these provisions, we must begin with the plain language of the statute. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). But it is well established that "[i]f . . . Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute . . . ." *Id.* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the [answer of the agency charged with implementing the statute] is based

---

intended to substantively alter the original statute. *Id.* §§ 2, 6; *see also* H.R. Rep. No. 111-42, at 3 ("This bill is intended to restate existing law without substantive change.").

    [2]  41 U.S.C. § 422(h)(3) was recodified at 41 U.S.C. § 1503(b).

on a permissible construction of the statute." *Id.* Moreover, "[i]f the agency interpretation is not in conflict with the plain language of the statute, deference is due [to that interpretation]." *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 417 (1992).

## A.

Section 422 is unambiguous with regard to the party responsible for making the required contract price adjustment. Section 422(h)(1), which creates the obligation for a contract price adjustment, requires that a contractor "agree to a contract price adjustment . . . for any increased costs paid to *such contractor* or subcontractor by the United States." As a matter of elementary grammar, the statute's use of "such" is a demonstrative adjective, and it must refer to a clear antecedent. *See Zuni Pub. Sch. Dist. No. 99 v. Dep't of Educ.*, 550 U.S. 81, 94 (2007) (explaining that use of "such" indicates a specific antecedent); *Gates & Fox Co. v. OSHA*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.) (same). Applied here, the reference to "such contractor" must be read to link the party responsible for the contract price adjustment to the specific contractor to whom the Government paid increased costs.

The numerous references to "the contractor" in the statute are similarly unambiguous. Section 422(h)(1) requires a contract price adjustment in response to "a change in *the contractor's* or subcontractor's cost accounting practices" or if "*the contractor* or subcontractor [fails] to comply with applicable cost accounting standards." Likewise, the provision limiting that cost adjustment, Section 422(h)(3), requires that the contract price adjustment be made on "relevant contracts between the United States and *the contractor*." Indeed, each use of the word "contractor" in Section 422(h)(3) is prefaced by the definite article "the." This use of a definite article raises an

extraordinarily strong inference that a specific contractor is referenced. *See, e.g.*, *Work v. McAlester-Edwards Coal Co.*, 262 U.S. 200, 208 (1923). As the United States Court of Appeals for the District of Columbia Circuit explained:

> It is a rule of law well established that the definite article "the" particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of "a" or "an."

*Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000) (quotation marks omitted). We have cited that rule to hold that the phrase "the use" in 35 U.S.C. § 271(e)(2)(A) must be interpreted to mean a specific use, i.e., "the use for which the FDA has granted an NDA." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003). And I would apply the rule here: the statutory references to "the contractor" must be read to burden the specific contractor that overcharged the Government, namely DIRECTV, with the obligation to make the contract price adjustment. Not only is the majority's contrary conclusion inconsistent with basic grammatical and interpretive rules, it is inconsistent with their reliance on those rules in Part I to interpret references to "the segment."

My conclusion is further confirmed by the statute's requirement that the contract price adjustment be made on "*relevant contracts* between the contractor and the United States." 41 U.S.C. § 422(h)(3). Congress did not authorize adjustments by any contractor or on any contract; the adjustments must be on a specific subset of contracts—"relevant contracts"—between the contractor and the United States. That requirement raises additional hurdles to recovering the adjustment on contracts between Raytheon or Boeing, on the one hand, and the United States, on the other.

For example, the Government's consent was presumably necessary in order for DIRECTV to transfer open contracts to Boeing and Raytheon. *See* 41 U.S.C. § 15;[3] *cf. ITT Gilfillan, Inc. v. United States*, 471 F.2d 1382, 1384 (Ct. Cl. 1973) (describing a transfer via novation between the United States and a successor contractor); *Gen. Elec. Co. v. United States*, 84 Fed. Cl. 129, 134-36 (2008) (describing an "Advance Agreement" between the United States and a successor contractor). But if that consent established a novation, the resulting contracts do not have "the contractor" who overcharged the Government as a party. Indeed, such contracts would be entirely new and distinct from those between DIRECTV and the United States. *See, e.g.*, Restatement (Second) of Contracts § 280.

The requirement that price adjustments be made on "relevant contracts" also raises issues far more significant than the formalistic effect of a novation. The contracts on which Raytheon and Boeing provided price adjustments are not in the record, and the trial court made no findings as to the nature of those contracts. The majority thus has no basis for concluding that the claimed reductions were provided on "relevant contracts" as the statute requires. Were the reductions provided on novated contracts, which are at least arguably "relevant"? Were they provided on different contracts with the same federal agency? Or did Boeing and Raytheon provide price reductions on contracts involving entirely different agencies? One would be hard-pressed to argue that contracts involving different projects or different agencies satisfy the statutory requirement that price adjustments be made on "relevant contracts." Thus, remand is necessary to complete the factual record. Beyond the majority's misreading of who

---

[3]   § 15 was recodified at the same time as § 422 at 41 U.S.C. § 6305. Pub. L. No. 111-350, § 3.

is responsible for any price adjustment, the majority conveniently ignores the "relevant contracts" requirement and its attendant factual inquiry, and focuses on the Government's concession, *ex poste*, that it received more savings from the successor contracts than DIRECTV would owe the Government absent such a transfer. *Majority Op.* at 15.

The majority identifies no limit to its logic. It becomes a continuous vortex where the Government can be forced to recover its increased costs from any person, on any contract, and in any form—regardless of the terms of the original contract—so long as the Government's recovery is "caused by" the original contractor and a contrary finding would result in what the majority deems a "windfall."[4] In my judgment, 41 U.S.C. § 422(h)(3) cannot be read to create such a *fait accompli* defense when a contractor acts without the Government's agreement. That is particularly true where, as here, the Government argues that it had little or no contemporaneous knowledge of the claimed cost reductions and there is no record evidence to the contrary.

On appeal, the Government specifically argued that it did not agree to recover its excess costs through cost reductions provided by Boeing and Raytheon. Gov't Br. 32-34, 47-49. Indeed, the Government states that "there is no evidence in the record that [Boeing and Raytheon] ever sent an invoice or told the Government at any time how much pension costs [the Government] was allegedly saving," Reply Br. 14, and that the cost reductions at issue were provided "officiously," Gov't Br. 42 n.6. Moreover, the trial court specifically found that DIRECTV "did not present any evidence regarding the role the

---

[4] Notably, the term "windfall" appears nowhere in the statue or the CAS.

[G]overnment played in either reviewing or approving the subject sales from DIRECTV to Raytheon or Boeing." *DIRECTV Grp., Inc. v. United States*, 89 Fed. Cl. 302, 307 (2009). Given that the record contains no evidence regarding the Government's agreement *vel non*, I would vacate the grant of summary judgment and remand for trial on that issue.

## B.

In support of its position, the majority cites—partially and selectively—48 C.F.R. § 9903.306(f). Majority Op. at 15. That provision states, in full:

Whether cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable technique, is a *contract administration matter*. The Cost Accounting Standards rules do not in any way restrict the capacity of *the parties* to select the method by which the cost impact attributable to a change in cost accounting practice is recognized.

48 C.F.R. § 9903.306(f) (2010) (emphases added). Notably absent from the majority's opinion is Paragraph (e) of the same section:

An adjustment to the contract price or of cost allowances pursuant to the Cost Accounting Standards clause at 9903.201–4(a) may not be required when a change in cost accounting practices or a failure to follow Standards or cost accounting practices is estimated to result in increased costs being paid under a particular contract by the United States. This circumstance may arise when a contractor is performing two or more covered contracts, and the change or failure affects all such contracts. The change or failure may in-

crease the cost paid under one or more of the con-
tracts, while decreasing the cost paid under one or
more of the contracts.  In such case, the Govern-
ment will not require price adjustment for any in-
creased costs paid by the United States, so long as
the cost decreases under one or more contracts are
at least equal to the increased cost under the
other affected contracts, *provided that the contrac-
tor and the affected contracting officers agree on
the method by which the price adjustments are to
be made for all affected contracts.*  In this situa-
tion, the contracting agencies would, of course, re-
quire an adjustment of the contract price or cost
allowances, as appropriate, to the extent that the
increases under certain contracts were not offset
by the decreases under the remaining contracts.

*Id.* § 9903.306(e) (emphasis added).  Paragraph (a)(4)(ii) of
the cross-referenced Cost Accounting Standards Clause,
48 C.F.R. § 9903.201-4(a) similarly requires a contractor
to "[n]egotiate with the Contracting Officer to determine
the terms and conditions under which a change may be
made to a cost accounting practice . . . ."  While I agree
that these regulations shed light on the matter at issue,
they do not support the majority's position.  I also agree
that these regulatory provisions provide contracting
officers with broad discretion to agree to alternative
methods of recouping overcharges.[5]  But the references to

---

[5]    Independent of the discretion recognized in 48
C.F.R. § 9903.306, we have long-recognized that—absent
a clear statutory or regulatory limit to their authority—
contracting officers have broad discretion in the admini-
stration of contracts under their supervision.  *PAI Corp. v.
United States,* 614 F.3d 1347, 1351 (Fed. Cir. 2010); *LDG
Timber Enters., Inc. v. Glickman,* 114 F.3d 1140, 1143
(Fed. Cir. 1997) (distinguishing *Fed. Crop Ins. Corp. v.
Merrill,* 332 U.S. 380 (1947)).  Included in that discretion

"contract administration matter" and "the capacity of the parties to select" in Paragraph (f) indicate that the Government must actually agree to the method selected, and Paragraph (e) states so explicitly.

Section 422(h) is silent on the manner in which the contractor can agree to a price adjustment and the manner in which the Government can recover increased costs from contractors. I believe 48 C.F.R. § 9903.306 is entitled to Chevron deference because it fills a legislative gap on those issues, is reasonable, and—properly interpreted—requires that the Government agree to the specific method of recovering overcharges by the contractor. However, summary judgment is inappropriate in this case because there is no evidence that the Government agreed to the cost reductions instead of a refund.

## II.

In support of its holding, the majority focuses its analysis on two FAR provisions: the Allowable Cost and Payment Clause and the Credits Clause. Doing so is misleading. Even if the FAR were to support the majority's holding, that support must yield vis-à-vis the CAS, at least on the question as to which contracts a particular cost is assigned. *See Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369, 1375 (Fed. Cir. 2003) ("When there is a conflict between FAR and CAS over

---

is the authority to waive provisions meant to protect the Government. *D & H Distrib. Co. v. United States*, 102 F.3d 542, 546 (Fed. Cir. 1996). Thus, even in the absence of regulations affirmatively granting discretion, I would recognize the power of contracting officers to waive the "relevant contracts" requirement. The Government argues that no such waiver was provided; that argument raises a question of fact that would preclude summary judgment.

allocability, the CAS regulation governs."). However, the FAR also does not support the majority's result.

I agree that, as with the CAS authorizing legislation, the Credits Clause has consistently burdened "the Contractor," in this case DIRECTV, with the obligation of paying the Government any amount owed. Majority Op. at 12. But the majority then finds that the Credit Clause's authorization for payment via a "cost reduction" permits DIRECTV to force the Government to accept a cost reduction provided by a third party, i.e. Boeing and Raytheon. *Id.* at 14. Not only is that result an erroneous reading of the Credits provision and contrary to the CAS authorizing statute, it requires the majority to ignore the plain language of 48 C.F.R. § 31.205-6(j)(4).

The Credits provision does not directly specify who must provide a cost reduction or cash refund. It does, however, provide guidance. The reference in the Credits provision to a "refund" necessarily implicates the recipient of the funds, i.e., the contractor, and the reference to a "cost reduction" as an alternative to a "refund" implies that both should originate from the same source. *See United States v. Stevens*, 130 S.Ct. 1577, 1588 (2010) (applying the doctrine of *noscitur a sociis*). Whatever ambiguity remains is resolved by Section 31.205-6(j)(4). The version of that provision in effect from September 20, 1989, through December 28, 1998, states that whenever "[pension] assets are constructively received by it for any reason, *the contractor* shall make a refund or give a credit to the Government for its equitable share." 48 C.F.R. § 31.205-6(j)(4) (1990) (emphasis added). In this case, DIRECTV received assets from the pension funds in question, and Section 31.205-6(j)(4) mandates that "the contractor," i.e., DIRECTV, "make a refund or give a credit to the Government for its equitable share."

The majority's blasé indifference to the plain language of § 31.205-6(j)(4), which applies whenever "[pension plan] assets are constructively received by [a contractor] for any reason," is apparently attributable to that provision appearing under the heading "Termination of defined benefit pension plans." *See* Majority Op. at 15-16. The majority plainly errs to the degree it impermissibly ignores the text of § 31.205-6(j)(4) based on the provision's heading. *See, e.g.*, *Intel Corp. v. Advanced Micro Devices*, 542 U.S. 241, 256 (2004) (stating that the caption cannot undo or limit the plain text of a statute). And the regulatory history of that provision makes clear that its coverage extends beyond pension plan terminations; indeed, the originally proposed language was specifically broadened so as to bring "*any reversions* to contractors of pension fund assets" within its scope. 54 Fed. Reg. at 34751 (emphasis added). Because DIRECTV retained pension surplus in this case, it has constructively received surplus assets and section 31.205-6(j)(4) requires DIRECTV to give a cost reduction or refund to the Government.

The result is no different if the majority instead relies on the Credit Clause's cross-reference to Section 31.205-6(j)(4) "for rules related to refund or credit to the Government upon termination of an overfunded defined benefit pension plan" because "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (citation omitted). The same rule applies to the construction of regulations. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995) (en banc). Consistent with that rule, an imprecise cross-reference in the Credits provision cannot be read to negate the applicability of Section 31.205-6(j)(4) in situations plainly covered by its text. Indeed, post-1998 versions of the Credits provision

remedy the imprecision, and cross-reference Section 31.205-6(j)(4) "for rules governing refund or credit to the Government *associated with pension adjustments and asset reversions.*" 63 Fed. Reg. at 58597 (emphasis added).

Thus, neither the CAS nor the FAR allow DIRECTV to escape its obligation to pay. Of course, the Government was free to agree to a different arrangement, but that is not what the majority holds. It forces the Government to take what the contractor gives it.

## III.

In condoning DIRECTV's *fait accompli* defense, the majority entirely neglects that *contracts* are at issue. The Government contracted for specific goods and services from a specific party, in exchange for payment of costs according to a specified formula. The contracts, along with the FAR and the CAS provisions incorporated therein, specified how cost adjustments should be made and from whom those adjustments could be recovered. The majority claims I argue for an "absurd result". *See* Majority Op. at 16. However, there is nothing absurd about holding a party to a contract and requiring them to pay when the contract says they must. DIRECTV sold a segment that included an overfunded pension fund. The sale price most certainly was increased to reflect the excess funds contained in the pension, most of which are available to the purchaser in the event the fund is terminated in the future. Thus, DIRECTV received more for the sale of the segment than it would have had the pension not been overfunded. A portion of that increased sale price is owed to the Government. The fact that Boeing and Raytheon will supposedly charge the Government less in the future is irrelevant to the fact that DIRECTV

has avoided its obligations under the contract to the potential detriment of the taxpayers.

This court has long recognized that "[t]he need for mutual fair dealing is no less required in contracts to which the [G]overnment is a party, than in any other commercial arrangement." *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988) (Newman, J.). Over and above the plain text of the statute and regulations at issue, as well as the maxim that "[m]en must turn square corners when they deal with the Government," *Rock Island v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.), fundamental fairness dictates that the Government should not be forced to accept price adjustments on contracts except those for which it bargained.

## CONCLUSION

Despite the myriad of interpretive rules available for guidance, *see* Karl Llewellyn, Remarks on the Theory of Appellate Decision, 3 Vand. L. Rev. 395, 401-06 (1950), the thrusts and parries of the classic canons—not to mention the rules of English grammar—proved inadequate to reach the result sought by the majority. Because the majority fails to apply these rules, I respectfully dissent.